UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

|  |  |
|---|---|
| BASKET ENTERTAINMENT, INC., a Delaware corporation; and<br><br>BASKET TECHNOLOGIES, INC., a Delaware corporation,<br><br>       Plaintiffs,<br>   v.<br><br>JOHN CHARLES BRAUN CANNATA, an individual; and<br><br>R ADVERTISING & SALES LIMITED LIABILITY COMPANY, a Florida limited liability company; and<br><br>MOBILE GAME ADVERTISING & MORE, LLC, a Wyoming limited liability company,<br><br>       Defendants. | Case No. 2:23-cv-1028 JES-KCD<br><br>Judge John E. Steele |

## AMENDED COMPLAINT—DEMAND FOR JURY TRIAL, REQUEST FOR DECLARATORY JUDGMENT, AND REQUEST FOR PERMANENT INJUNCTIVE RELIEF

Plaintiff Basket Entertainment, Inc. ("Basket Entertainment") and Plaintiff

Basket Technologies, Inc. ("Basket Technologies," and with Basket Entertainment,

"Basket," or "Plaintiffs"), for their Amended Complaint against Defendants John

Charles Braun Cannata ("Cannata"), R Advertising & Sales Limited Liability Company ("RAS"), and Mobile Game Advertising & More, LLC ("Mobile Game," and with RAS, the "Cannata Companies") (the Cannata Companies with Cannata, "Defendants"), state as follows:

## INTRODUCTION

1.    In July 2023, Basket Entertainment and Basket Technologies appointed Cannata to their Boards of Directors and hired him as Basket's Vice President of Games Operations in order to expand Basket's business, which includes the acquisition and maintenance of online and mobile games, including for the gaming platform, Roblox.com ("Roblox"). Basket and Cannata agreed that, among other things, Cannata would identify acquisition targets for Basket and work with Basket to grow and expand the user base for those games. Instead, almost immediately after joining Basket, Cannata engaged in an outrageous campaign of double-dealing, acquiring ownership interests in at least two online games for himself without ever presenting them as opportunities to Basket. One of those games, Blade Ball, became the No. 2 earnings game on Roblox, while the other, Obby But You're On A Bike (the "Bike Game," and with Blade Ball, the "Usurped Games"), rose as high as No. 6. The Usurped Games have generated, and continue to generate, millions of dollars in revenues per month for Cannata. Worse, Cannata actively concealed his misconduct and, once discovered by Basket, misrepresented his prior and ongoing

negotiations and transactions with the creators of the Usurped Games. Upon information and belief, Cannata also surreptitiously acquired an interest in derivative games that directly compete with games owned, in part, by Basket. In doing so, Cannata flagrantly breached the most basic fiduciary duties a director and officer owes to a corporation: loyalty, good faith, and fair dealing. Moreover, Cannata usurped these lucrative corporate opportunities while Basket was in the middle of a capital raise, causing Basket reputational harm and disrupting cash flow that could have been used to acquire games. As a result, Basket seeks actual and punitive damages from Cannata, in addition to the other forms of relief described below.

## **PARTIES**

2.    Basket Entertainment, a Delaware corporation with its principal place of business in San Francisco, California, is a citizen of Delaware and California.

3.    Basket Technologies, a Delaware corporation with its principal place of business in San Francisco, California, and a wholly owned subsidiary of Basket Entertainment, is a citizen of Delaware and California.

4.    Basket is, and at all times material hereto was, in the business of, among other things, acquiring, owning, maintaining, and operating online and mobile application games on Roblox and other user generated gaming platforms.

5.    Cannata is a citizen of Florida because he is, and at all times material hereto was, domiciled in Bonita Springs, Florida.

6.     RAS is a citizen of Florida because (a) it is, and at all times material hereto was, a Florida limited liability company, and (b) Cannata, a citizen of Florida, is the Managing Member of RAS and, upon information and belief, its sole member.

7.     Mobile Game is a citizen of Florida because (a) Mobile Game is a Wyoming limited liability company with its principal place of business in Florida, (b) Cannata, a citizen of Florida, is the Managing Member of Mobile Game and, upon information and belief, owns 95% of Mobile Game's membership interests, and (c) upon information and belief, the other 5% is owned by Michael Duffy ("Duffy"),  and Duffy is a citizen of Florida who is, and at all times material hereto was, domiciled in Bonita Springs, Florida. Accordingly, Mobile Game is a citizen of Florida. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (a limited liability company is a citizen of any state of which a member of the company is a citizen).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1), because all Plaintiffs and Defendants are of diverse citizenship, and the amount in controversy exceeds $75,000.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (a) all Defendants reside, as defined in Section 28 U.S.C. § 1391(c), within the judicial district for the U.S. District Court for the Middle District of Florida; and

(b) a substantial part of the events giving rise to this claim occurred within the Middle District of Florida.

## FACTUAL ALLEGATIONS

### The Roblox Business Model

10.    Roblox is an online and mobile gaming platform that provides user entertainment and allows owners of Roblox games to monetize their content through a variety of methods and strategies, including utilizing subscriptions, charging a one-time access fee for users to access a game, providing in-game items or abilities that users can purchase, selling immersive advertising to be presented within the game experience, offering engagement-based payouts for premium subscriber interactions with games, and offering private servers for users to play games just with their friends.

11.    Game owners use these monetization strategies to earn virtual currency on Roblox ("Robux"), which they can then exchange for legal tender through the Roblox Developer Exchange Program ("DevEx").

12.    In addition to earning money within the Roblox framework, game owners can also monetize games through various methods including, for example, third-party advertising, intellectual property licensing, brand partnerships and custom activations within games, creation of derivative works (including game sequels), and merchandising.

13.    Basket is in the business of acquiring ownership interests in games (either through cash purchases or in-kind services wherein Basket provides game maintenance and/or promotional services to the game creators/developers/owners), and monetizing such games through in-game platform revenue, third-party advertising, brand partnerships, and custom activations within games. In addition, Basket performs ongoing game maintenance services (such as icon creation), post-launch game support (including providing ongoing in-game events) and updates (e.g., addressing bug fixes as well as developing new content and levels within existing games), as well as providing promotional services (including social media promotions relating to the games and community development and management for the games outside of Roblox). Basket also develops sequels and other derivative works based on the original games.

### Cannata Joins Basket's Board of Directors and Becomes Vice President of Games Operations

14.    On or about July 26, 2023, Basket Entertainment executed a Unanimous Written Consent increasing the total number of directors on Basket Entertainment's Board of Directors from two to three, and appointing Cannata to fill the third seat on the Board. (Unless otherwise indicated, all dates hereinafter refer to calendar year 2023.)

15.    On or about July 26, Basket Technologies executed a Unanimous Written Consent increasing the total number of directors on Basket Technologies'

Board of Directors from two to three and appointing Cannata to fill the third seat on the Board.

16.    On or about July 27, Cannata accepted Basket's offer to employ him as Vice President of Games Operations.

17.    As Vice President of Games Operations, Cannata was responsible for, among other things, the identification of mobile games hosted by Roblox for Basket to acquire, the facilitation of Basket's purchase of games hosted by Roblox, and the support, promotion, and expansion of such games.

### Cannata Immediately Begins Competing Against Plaintiffs and Usurping Lucrative Corporate Opportunities for His Own Personal Gain

Cannata's Misconduct Relating to the Bike Game

18.    On or about August 14, Cannata advised Basket's Co-Founder, Director, and Chief Operating Officer, Emily Yuan ("Yuan"), that Cannata had obtained for Basket an 8% ownership interest in the Bike Game in exchange for Basket's agreement to provide certain game experience improvement services consisting of the creation and testing of icons to increase the user base for the Bike Game (the "Bike Game Maintenance Services").

19.    The Bike Game was in the top six games on Roblox in October based on concurrent users, and the Bike Game generated $545,365 during that month. (For

the avoidance of doubt, all figures preceded with "$" herein refer to U.S. dollars, not Robux.)

20.    On October 10, Cannata had two telephone calls (the "<u>October 10 Calls</u>") with Yuan and Basket's Co-Founder, Director, and Chief Executive Officer, Nicolas Laqua ("<u>Laqua</u>"), in which Cannata advised Yuan and Laqua that he had surreptitiously negotiated and signed a written letter of intent several weeks ago with a Basket competitor, MiniClip, SA ("<u>MiniClip</u>"), pursuant to which Cannata would receive $10 Million in exchange for (i) Cannata leaving Basket to join MiniClip in a game management role and (ii) selling his personal interests in certain games to MiniClip, *including a 42% personal interest in the Bike Game*. According to Cannata, he had entered into an agreement with the two creators (who are minor children) of the Bike Game (the "<u>Minor Developers</u>") for a 42% ownership interest in the Bike Game (i.e., a 50% interest minus the 8% interest Cannata had supposedly acquired for Basket).

21.    On October 11, Cannata had a telephone call with Yuan (the "<u>October 11 Call</u>"), during which he advised Yuan that the deal with MiniClip actually consisted of a $10M fee for the acquisition of games as well as an additional $10M milestone payment for his provision of game management services to MiniClip (the "<u>$20 Million Transaction</u>"). Cannata also told Yuan that he had plans to meet with the Minor Developers' parents that weekend (i.e., the weekend of October 13) to

finalize an agreement with the Minor Developers' parents relating to his acquisition of a 50% ownership interest in the Bike Game.

22.     During the October 11 Call, Cannata also represented that the MiniClip Transaction was almost finalized and contingent on him obtaining executed paperwork from the Bike Game Minor Developers' parents. Cannata also stated that he thought MiniClip would agree to Basket keeping 8% of the Bike Game, along with monetization rights for third-party advertising. In an effort to further obfuscate the context around the MiniClip Transaction, Cannata represented that several other parties were involved as well, including another Roblox Developer named Christopher Boomer (a/k/a Scriptbloxian), an individual with whom one of the Cannata Companies previously was involved in Roblox game-related litigation. Yuan asked Cannata if Basket needed to sign anything with MiniClip, and Cannata said Basket did not.

23.     The morning of October 12, Cannata sent the following text message (the "October 12 Text Message") to Basket's Chief Legal Officer, Holly Grochmal ("Grochmal"), along with a draft, unsigned version of an acquisition agreement for the Bike Game and a "redline" of the same against an earlier, undisclosed draft:



24.    The October 12 Text Message confirmed that, contrary to Cannata's prior representations to Basket, he had never acquired for Basket *any* ownership interest in the Bike Game.

25.    On October 12, Laqua had a telephone call with Cannata (the "First October 12 Call"). During the First October 12 Call, Laqua explained to Cannata that Basket had retained legal counsel in connection with Cannata's misappropriation of Basket's resources pursuant to a scheme to increase the value of the Bike Game in connection with Cannata's usurpation of that lucrative corporate opportunity for his own personal financial gain.

26.    During the First October 12 Call, Laqua also advised Cannata that Basket's legal counsel would be sending a letter to him the following day regarding Basket's concerns, and that Basket would be contacting MiniClip to protect its legal

interests given Cannata's misconduct vis-à-vis the Bike Game which Cannata was threatening to sell to MiniClip. In response, Cannata stated that Basket could contact MiniClip but that in fact (contrary to what he had previously represented to Basket), MiniClip was not the counter-party in the $20 Million Transaction. Cannata refused to disclose the actual counter-party when asked by Laqua. Cannata then chuckled and said words along the lines of, "Have fun digging and figuring out what's going on."

27.     Shortly after the Second October 12 Call, Cannata texted his fellow Directors and Officers (Laqua and Yuan) the "face with tears of joy" emoji 😂.

28.     Later that day on October 12, Grochmal and Cannata had a telephone call (the "Second October 12 Call"), in which Cannata repeated his original claim from the October 10 Call that, contrary to what he had just represented to Laqua earlier that day in the First October 12 Call, the counter-party in the $20 Million Transaction was, in fact, MiniClip. Basket later contacted MiniClip directly and confirmed that these statements were not true.

29.     Basket subsequently learned that, contrary to Cannata's above-described representations regarding his alleged plans to meet with the Minor Developers' parents the weekend of October 13 to finalize and execute the draft documents sent by Cannata to Grochmal in the October 12 Text Message, Cannata had already executed an acquisition agreement for his 50% ownership interest in the

Bike Game with the Minor Developers' parents almost a month earlier, on September 21 (the "Bike Game Purchase Agreement").

30.    Pursuant to the Bike Game Purchase Agreement, Cannata's solely owned company, RAS, obtained a 50% interest in the Bike Game.

31.    Cannata is using one of his Roblox accounts ("Cannata Account #1") to collect revenues relating to the Bike Game. Defendant Mobile Game is the Cannata entity associated with Cannata Account #1.

Cannata's Misconduct Relating to Blade Ball

32.    On or about August 26, Cannata surreptitiously acquired a 45% ownership interest in Blade Ball, another Roblox game, from unknown developers and/or owners of that game. Cannata acquired his 45% ownership interest in this game using Cannata Account #1 via an exchange on his private Discord account (Discord is an instant messaging and "Voice over Internet Protocol" social platform that allows users to send text messages and make voice calls using internet instead of a phoneline). As noted above, Defendant Mobile Game is the Cannata entity associated with Cannata Account #1.

33.    Cannata did not disclose to Basket that he planned to acquire, or had acquired, an ownership interest in Blade Ball. Rather, Basket only learned of Cannata's involvement in Blade Ball after Basket joined an official Roblox Developer Community server on Guilded (a platform through which Roblox

conducts developer relations) (the "Guilded DR Server") on October 16. Specifically, on October 16, Yuan discovered an October 9 request made by Cannata using Cannata Account #1 Account to create a new private channel for Blade Ball – i.e., while Cannata still served as an Officer and Director of Basket.

34.    Prior to October 16, Basket had relied on Cannata, its Vice President of Games Operations, to monitor and otherwise represent Basket's interests on the Guilded DR Server. Accordingly, there had been no reason for another member of Basket's executive team to join the Guilded DR Server, either individually or using Basket's official Guilded account, and none had done so.

35.    On or about October 17, Cannata deleted the channel creation request for Blade Ball, presumably in an attempt to conceal his involvement in Blade Ball after he discovered that Basket's official Guilded Account had joined the Guilded DR Server.

36.    Not only did Cannata not disclose his acquisition of a 45% ownership interest in Blade Ball, he actively concealed from Basket his ownership interest in Blade Ball and opined that Blade Ball should not be pursued due to an unidentified intellectual property issue.

37.    During Cannata's tenure, Basket maintained an internal "Game Sourcing" Discord channel (the "Basket Sourcing Channel"). Basket contracted with outside game sources to discover and refer games to Basket for acquisition ("Basket

Game Referral Contractors") by messaging Basket on the Basket Sourcing Channel. As Basket's Vice President of Games Operations responsible for game acquisitions, it was Cannata's responsibility to monitor the Basket Sourcing Channel and evaluate games referred to Basket by Basket Game Referral Contractors for potential acquisition.

38.    On or about September 9, one of the Basket Game Referral Contractors, "return.s" (also known by another Discord user name, "Record") ("Return/Record"), referred Blade Ball to Cannata in his capacity as Basket's Vice President of Games Operations, as a potential acquisition for Basket with an asking price of $1 Million.

39.    Rather than disclose to Return/Record (or Basket) that he *already* had acquired a 45% ownership interest in Blade Ball (for himself), Cannata responded that there was an "IP issue with that game," which suggested it would be problematic for Basket to acquire:



40.     During the month of October, Blade Ball was the No. 2 earning game on Roblox, and upon information and belief, Blade Ball was generating between $5 Million and $20 Million in monthly revenues for its owners.

<u>Cannata's Other Gross Misconduct</u>

41.     Cannata's gross breaches of his fiduciary duties are not limited to the Bike Game and Blade Ball. Upon information and belief, while serving as an Officer and Director of Basket, Cannata acquired an ownership interest in a derivative of the Bike Game, Bike of Hell, which is advertised as having been created in partnership with the Minor Developers of the Bike Game:



42.   Basket's belief is based on, among other things, the fact that Cannata is social friends with the creator of Bike of Hell.

43.   In addition, upon information and belief, while serving as an Officer and Director of Basket, Cannata acquired an interest in two games (i.e., Anime Sword Fighters Simulator and Farm Factory Tycoon X), which are based on and derivative works of games owned, in part, by Basket (i.e., Sword Fighters Simulator and Farm Factory Tycoon, respectively).

44.   Cannata did not disclose his involvement with, much less offer Basket the opportunity to acquire an interest in, Bike of Hell, Anime Sword Fighters Simulator, or Farm Factory Tycoon X (the "Derivative Games").

45.     The Derivative Games are competing directly with the original games owned in part by Basket, thereby reducing the values of Basket's ownership interests in the original games and the revenues generated by such original games.

46.     Upon information and belief, while serving as an Officer and Director of Basket, Cannata acquired interests in games other than the Usurped Games and the Derivative Games without disclosing or presenting such opportunities to Basket.

## COUNT I
## BREACH OF FIDUCIARY DUTY (CANNATA)

47.     Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

48.     As a Director and Officer of Basket, Cannata owed Basket fiduciary duties, including duties of loyalty, candor, fair dealing, and good faith, as well as the duty not to usurp corporate opportunities and the duty not to misappropriate corporate assets.

49.     Cannata breached his fiduciary duties by acting in his own interests and not in the interests of Basket by, *inter alia*:

      a.     usurping Basket's opportunity to acquire an interest, or otherwise participate, in the Bike Game;

      b.     usurping Basket's opportunity to acquire an interest, or otherwise participate, in Blade Ball;

      c.      making material misrepresentations to Basket, its officers, and its Boards of Directors regarding both the Bike Game and Blade Ball, and actively concealing his involvement in the same; and

      d.      usurping Basket's opportunity to acquire an interest in the Derivative Games, and actively concealing his involvement in the same.

50.    Cannata's conduct was intentional, reckless, in bad faith, and in total disregard of the fiduciary duties he owed to Basket.

51.    As a direct and proximate result of Cannata's breaches of fiduciary duties, Basket has lost, and stands to lose, millions of dollars in various revenue streams (including, without, limitation, advertising revenue and platform revenues) associated with the Bike Game, Blade Ball, and the Derivative Games. In addition, such breaches have negatively impacted Basket's ability to acquire games, adversely affected Basket's ability to generate additional users for other Basket games, disrupted in-progress fundraising and commercial and monetization efforts, and caused Basket reputational harm.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Cannata for damages, punitive damages, pre- and post-judgment interest, court costs, equitable relief, including the disgorgement of profits, imposition of a constructive trust over the Usurped Games and the proceeds from the Usurped Games, a permanent injunction transferring Cannata's ownership interests in the

Usurped Games to Plaintiff Basket Entertainment, and such other and further relief as is just and proper.

## COUNT II
## FRAUDULENT MISREPRESENTATION (CANNATA)

52.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

53.    Cannata made false statements to Basket concerning material facts.

54.    Specifically, Cannata told Yuan that he had acquired an 8% ownership interest in the Bike Game for Basket, when in fact he had not secured such an ownership interest.

55.    Additionally, Cannata fraudulently concealed from Basket that he had actually acquired a 50% ownership interest in the Bike Game on his own behalf.

56.    Cannata knew that his representations regarding Basket's ownership interest in the Bike Game were false.

57.    Cannata intended to induce Basket to act on his misrepresentations.

58.    The Company took action relying on Cannata's misrepresentations. Specifically, Basket provided the Bike Game Maintenance Services based on the false understanding that Basket had an 8% ownership interest in the Bike Game.

59.    Cannata's misrepresentations caused Basket injury through, among other things, the expenses it incurred in providing the Bike Game Maintenance Services.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Cannata for compensatory damages, punitive damages, pre- and post-judgment interest, equitable relief, including the disgorgement of profits, imposition of a constructive trust over the Usurped Games and the proceeds from the Usurped Games, a permanent injunction transferring Cannata's ownership interests in the Usurped Games to Plaintiff Basket Entertainment, court costs and such other and further relief as is just and proper.

## COUNT III
## PUNITIVE DAMAGES (CANNATA)

60.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

61.    Cannata's misconduct as described herein was intentional and outrageous.

62.    Cannata knew that his conduct was wrong, and also knew that his breach of fiduciary duties and fraudulent misrepresentations would damage Basket. Despite this knowledge, Cannata intentionally pursued his course of misconduct, resulting in injury and damage to Basket as set forth herein.

63.    Accordingly, Basket will be able to present clear and convincing evidence that Cannata was personally liable for intentional misconduct pursuant to Fla. Stat. Ann. § 768.72.

64.     Plaintiffs reserve all rights to amend this Complaint following further investigation and discovery.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Cannata for punitive damages based on the foregoing intentional misconduct.

**COUNT IV**
**DECLARATORY JUDGMENT**
**REVERSE VEIL PIERCING (RAS)**

65.     Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

66.     As set forth above, Cannata owed and breached fiduciary duties he owed to Plaintiffs.

67.     RAS is jointly and severally liable for Cannata's breaches of fiduciary duties because RAS acted as Cannata's alter ego with respect to, among other things, its improper acquisition of an ownership interest in the Bike Game, which was rightfully Basket's corporate opportunity.

68.     Upon information and belief, as the sole and controlling member of RAS, Cannata does, and at all relevant times did, dominate RAS in that, among other things, Cannata directs all actions undertaken by RAS as its sole member, Cannata failed to observe corporate formalities, Cannata commingled his own assets with

those of RAS, and Cannata used RAS simply as a façade for his own misconduct (i.e., breach of his fiduciary duties to Plaintiffs).

69.     Upon information and belief, RAS is not adequately capitalized to satisfy the foreseeable liabilities of Cannata's misconduct (i.e., breach of his fiduciary duties to Plaintiffs).

70.     Upon information and belief, Cannata deliberately left RAS undercapitalized in order to shield himself from liability and judgment for his own breach of fiduciary duties.

71.     When viewed in light of the events that have preceded this action, Cannata's abuse of the corporate form is fundamentally unfair, justifying "reverse" piercing of the corporate veil under applicable law.

72.     Cannata and RAS have participated in a scheme to defraud Plaintiffs via the manipulation of the corporate form. As such, Cannata and RAS are alter egos of each other and liable to Plaintiffs for all monies due to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request an order from this Court declaring RAS to be the alter ego of Cannata, jointly and severally liable to Plaintiffs for any judgment entered against Cannata in favor of Plaintiffs.

## COUNT V
## DECLARATORY JUDGMENT
## REVERSE VEIL PIERCING (MOBILE GAME)

73.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

74.    As set forth above, Cannata owed and breached fiduciary duties he owed to Plaintiffs.

75.    Mobile Game is jointly and severally liable for Cannata's breaches of fiduciary duties because Mobile Game acted as Cannata's alter ego with respect to, among other things, its use of Cannata Account #1 to surreptitiously acquire an ownership interest in Blade Ball on behalf of Cannata and funnel the proceeds of Cannata's breaches to Cannata.

76.    Upon information and belief, as the controlling member of Mobile Game, and owner of 95% of the equity in Mobile Game, Cannata does, and at all relevant times did, dominate Mobile Game in that, among other things, (i) Cannata directs all actions undertaken by Mobile Game without oversight by its only other member, Duffy, (ii) Cannata failed to observe corporate formalities, (iii) Cannata commingled his own assets with those of Mobile Game, and (iv) Cannata used Mobile Game simply as a façade for his own misconduct (i.e., breach of his fiduciary duties to Plaintiffs).

77.    Upon information and belief, Mobile Game is not adequately capitalized to satisfy the foreseeable liabilities of Cannata's misconduct (i.e., breach of his fiduciary duties to Plaintiffs).

78.    Upon information and belief, Cannata deliberately left Mobile Game undercapitalized in order to shield himself from liability and judgment for his own breach of fiduciary duties.

79.    When viewed in light of the events that have preceded this action, Cannata's abuse of the corporate form is fundamentally unfair, justifying "reverse" piercing of the corporate veil under applicable law.

80.    Cannata and Mobile Game have participated in a scheme to defraud Plaintiffs via the manipulation of the corporate form. As such, Cannata and Mobile Game are alter egos of each other and liable to Plaintiffs for all monies due to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request an order from this Court declaring Mobile Game to be the alter ego of Cannata, jointly and severally liable to Plaintiffs for any judgment entered against Cannata in favor of Plaintiffs.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (RAS)

81.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

82.    In the event the Court does not find that Cannata and RAS are alter egos, and finds that reverse veil piercing is not appropriate as to RAS, RAS knowingly aided and abetted Cannata's breach of the fiduciary duties discussed herein.

83.    Cannata owed and breached fiduciary duties it owed to Plaintiffs.

84.    RAS had knowledge of Cannata's fiduciary relationship with Plaintiffs, because Cannata is the sole member of RAS.

85.    RAS had knowledge of Cannata's breach of the fiduciary duties owed to Basket because RAS acted in concert with, on behalf of, and at the direction of Cannata, to acquire an interest in the Bike Game, which it knew to be Plaintiffs' corporate opportunity.

86.    In serving as the vehicle by which Cannata acquired interests in the Bike Game, RAS knowingly participated in, and provided substantial assistance and encouragement to, Cannata's scheme to breach his fiduciary duties to Plaintiffs.

87.    RAS aided and abetted Defendant Cannata in his breach of fiduciary duties by, among other things, acquiring on behalf of Cannata (RAS's sole member

and owner) interests in the Bike Game, which was rightfully Plaintiff's corporate opportunity.

88.    RAS's misconduct constitutes aiding and abetting Cannata's breach of fiduciary duty and subjects RAS to liability for the harm suffered by Plaintiff.

WHEREFORE Plaintiffs respectfully request that the Court enter judgment against RAS for all consequential damages, pre- and post-judgment interest, court costs, equitable relief, including the disgorgement of profits, imposition of a constructive trust over the Usurped Games and the proceeds from the Usurped Games, a permanent injunction transferring RAS's ownership interests in the Usurped Games to Plaintiff Basket Entertainment, and such other and further relief as is just and proper.

## COUNT VII
## AIDING AND ABETTING
## <u>BREACH OF FIDUCIARY DUTY (MOBILE GAME)</u>

89.    Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

90.    In the event the Court does not find that Cannata and Mobile Game are alter egos, and finds that reverse veil piercing is not appropriate as to Mobile Game, Mobile Game knowingly aided and abetted Cannata's breach of the fiduciary duties discussed herein.

91.    Cannata owed and breached fiduciary duties it owed to Plaintiffs.

92.     Mobile Game had knowledge of Cannata's fiduciary relationship with Plaintiffs because Cannata owns 95% of Mobile Game's membership interests and is Mobile Game's Managing Member.

93.     Mobile Game had knowledge of Cannata's breach of the fiduciary duties owed to Plaintiffs because Mobile Game acquired Cannata's 45% interest in Blade Ball through Mobile Game's and Cannata's Cannata Account #1, which Mobile Game knew to be Plaintiffs' corporate opportunity.

94.     In serving as the vehicle by which Cannata acquired his interest in Blade Ball, Mobile Game knowingly participated in, and provided substantial assistance and encouragement to, Cannata's scheme to breach his fiduciary duties to Plaintiffs.

95.     Mobile Game aided and abetted Cannata in his breach of fiduciary duties by, among other things, acquiring on behalf of Cannata (Mobile Game's Managing Member and owner of 95% of the equity interest in Mobile Game) interests in Blade Ball, which was rightfully Plaintiff's corporate opportunity.

96.     Mobile Game's misconduct constitutes aiding and abetting Cannata's breach of fiduciary duty and subjects Mobile Game to liability for the harm suffered by Plaintiff.

WHEREFORE Plaintiffs respectfully request that the Court enter judgment against Mobile Games for all damages, pre- and post-judgment interest, court costs, equitable relief, including the disgorgement of profits, imposition of a constructive trust over the Usurped Games and the proceeds from the Usurped Games, a permanent injunction transferring Mobile Game's ownership interests in the Usurped Games to Plaintiff Basket Entertainment, and such other and further relief as is just and proper.

**COUNT VIII**
**<u>CIVIL CONSPIRACY (RAS)</u>**

97.     Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

98.     In the event the Court does not find that Cannata and RAS are alter egos, and finds that reverse veil piercing is not appropriate as to RAS, RAS participated in a civil conspiracy with Cannata to deprive Plaintiffs of the rights to, and revenue generated from, the Bike Game.

99.     Cannata and RAS entered into an agreement whereby RAS, acting on behalf of and for the benefit of Cannata, would acquire an ownership interest in the Bike Game.

100.    The acquisition of the Bike Game by RAS was in furtherance of Cannata's breach of his fiduciary duties to Plaintiffs, in that the acquisition of the

Bike Game was actually a Basket corporate opportunity which Cannata and RAS misappropriated for their own benefit.

101.  RAS knew that Cannata owed a fiduciary duty to Plaintiffs to present the acquisition of an ownership interest in the Bike Game to Plaintiffs as a corporate opportunity because Cannata is the sole and Managing Member of RAS.

102.  RAS acquired a 50% ownership interest in the Bike Game in furtherance of the aforementioned agreement and conspiracy.

103.  Plaintiffs have experienced, and continue to experience, significant damages as a result of RAS's and Cannata's conspiracy, including but not limited to the loss of significant revenue generated by the Bike Game, and the loss of an ownership interest in the Bike Game thereby depriving Plaintiffs of a valuable asset to market to potential investors.

WHEREFORE Plaintiffs respectfully request that the Court enter judgment against RAS for all damages, pre- and post-judgment interest, court costs, equitable relief, including the disgorgement of profits, imposition of a constructive trust over the Usurped Games and the proceeds from the Usurped Games, a permanent injunction transferring RAS's ownership interests in the Usurped Games to Plaintiff Basket Entertainment, and such other and further relief as is just and proper.

## COUNT IX
## CIVIL CONSPIRACY (MOBILE GAME)

104.   Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

105.   In the event the Court does not find that Cannata and Mobile Game are alter egos, and finds that reverse veil piercing is not appropriate as to Mobile Game, Mobile Game participated in a civil conspiracy with Cannata to deprive Plaintiffs of the rights to, and revenue generated from, Blade Ball.

106.   Cannata and Mobile Game entered into an agreement whereby Mobile Game, acting on behalf of and for the benefit of Cannata, would acquire an ownership interest in Blade Ball.

107.   The acquisition of Blade Ball by Mobile Game was in furtherance of Cannata's breach of his fiduciary duties to Plaintiffs, in that the acquisition of Blade Ball was a Basket corporate opportunity.

108.   Mobile Game knew that Cannata owed a fiduciary duty to Plaintiffs to present the acquisition of an ownership interest in Blade Ball to Plaintiffs as a corporate opportunity because Cannata is the Managing Member of Mobile Game and owns 95% of the equity in Mobile Game.

109.   Mobile Game acquired a 45% ownership interest in Blade Ball through Mobile Game's and Cannata's Cannata Account #1, in furtherance of the aforementioned agreement and conspiracy.

110.   As a result, Plaintiffs have experienced, and continue to experience, significant damages from Mobile Game's and Cannata's conspiracy, including but not limited to the loss of significant revenue generated by Blade Ball, and the loss of an ownership interest in Blade Ball thereby depriving Plaintiffs of a valuable asset to market to potential investors.

WHEREFORE Plaintiffs respectfully request that the Court enter judgment against Mobile Game for all damages, pre- and post-judgment interest, court costs, equitable relief, including the disgorgement of profits, imposition of a constructive trust over the Usurped Games and the proceeds from the Usurped Games, a permanent injunction transferring Mobile Game's ownership interests in the Usurped Games to Plaintiff Basket Entertainment, and such other and further relief as is just and proper.

**COUNT X**
**DEMAND FOR ACCOUNTING (RAS AND MOBILE GAME)**

111.   Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

112.   Upon information and belief, Defendants Cannata, RAS, and Mobile Game have intermingled monies and assets, including the proceeds and profits from the Usurped Games and the Derivative Games, by: (1) representing Cannata's ownership interests in the Usurped Games and the Derivative Games as Mobile

Games' and RAS's ownership interests; and (2) disregarding the corporate form of these companies.

113.   Therefore, the amount of monies and assets in each of the Cannata Companies, including the proceeds and profits from the Usurped Games and Derivative Games, and the actual ownership interests in the Usurped Games and Derivative Games, can only be totaled and verified by an accounting.

114.   Plaintiffs, by way of their equitable ownership of and constructive trust over the Usurped Games and Derivative Games, have a right to an accounting of RAS's and Mobile Games' books and records, especially because all Defendants, jointly and severally, are liable to Plaintiffs for the proceeds and profits from the Usurped Games and Derivative Games.

WHEREFORE, Plaintiffs respectfully request that the Court enter an order finding that because of the intermingling of corporate assets and opportunities, the transactions are sufficiently complicated to warrant an equitable accounting of RAS's and Mobile Games' books and records, as a jury would not be reasonably able, based on the time and effort required, to assess the evidence and reach an accurate value of the amount owed.

## COUNT XI
## CONSTRUCTIVE TRUST (ALL DEFENDANTS)

115.   Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

116.  In his role as a director and officer of Basket, Cannata undertook express, affirmative duties and promised to act for the benefit of, and in the best interest of, Basket.

117.  Basket relied on Cannata's promises to act in its best interest when Basket appointed him a Director, hired him as Vice President of Games Operations, and allowed him to operate on behalf of Basket.

118.  Upon information and belief, RAS and Mobile Game, directed by and for the benefit of Cannata, acquired ownership interests in the Usurped Games and Derivative Games.

119.  Defendants' misconduct relating to the Usurped Games and Derivative Games will likely result in continued financial harm to Basket, including but not limited to the loss of significant revenue generated by the Usurped Games and Derivative Games, and the loss of ownership interests in the Usurped Games and Derivative Games thereby depriving Basket of a valuable asset to market to potential investors.

120.  Basket fears that without relief from the Court, the ownership interests in the Usurped Games and Derivative Games may be distributed or sold to other entities, including but not limited to other potential companies owned and operated by Cannata, or third parties, as Cannata has already at least attempted to sell his and the Cannata Companies' ownership interests in certain games.

WHEREFORE, Plaintiffs respectfully request that this Court enter an order imposing a constructive trust in Plaintiffs' favor on: (a) the Usurped Games and Derivative Games; and (b) all proceeds and revenue received by Cannata and/or the Cannata Companies generated by the Usurped Games and Derivative Games.

## COUNT XII
## PERMANENT INJUNCTION (ALL DEFENDANTS)

121.   Plaintiffs re-allege and incorporate by reference the allegations of Paragraphs 1-46 as though fully set forth herein.

122.   Basket has suffered, and will continue to suffer, irreparable injury for which monetary damages are inadequate, in that Defendants' have, and will continue to, deprive Basket of assets—namely, the ownership interests in the Usurped Games and Derivative Games —to market to potential investors.

123.   Without a permanent injunction ordering Defendants to transfer any and all ownership interests in the Usurped Games and Derivative Games to Basket, Basket will continue to suffer damages as described herein.

124.   Considering the balance of hardships, a permanent injunction is warranted. In the absence of a permanent injunction ordering Defendants to transfer any and all ownership interests in the Usurped Games and Derivative Games to Basket, Defendants will continue in perpetuity to receive the revenue and proceeds from such games, and other advantages related to owning the Usurped Games and Derivative Games, including highlighting such ownership interests in soliciting

investment and financing. In contrast, if a permanent injunction is granted, Defendants will be deprived of only that which they were never entitled to in the first place; namely, ownership interests in the Usurped Games and Derivative Games which were, and are, Basket's corporate opportunities.

125. The public's interest in enforcing the fiduciary duties owed by directors and officers to a corporation will be reinforced and strengthened by a permanent injunction, in that those who owe a special duty of care, loyalty, and fair dealing to their fiduciary will not be encouraged to usurp corporate opportunities believing that, even if required to pay monetary damages to their victims, they will nonetheless be permitted to retain their ownership rights in the ill-gotten property and/or interests in perpetuity.

WHEREFORE, Plaintiffs respectfully request an order from this Court requiring the transfer of any and all of each Defendant's ownership interest(s) in the Usurped Games and Derivative Games from Defendants to Plaintiff Basket Entertainment.

## PRAYER FOR RELIEF AND JURY TRIAL DEMAND

WHEREFORE, Plaintiffs pray for relief as follows:

a.    Plaintiffs demand a jury trial.

b.    A judgment awarding Plaintiffs compensatory damages as a result of Defendants' misconduct, together with interest and costs for damages for which an

adequate remedy at law exists, including lost profits, and a decrease in value to Plaintiffs' business.

c.     Disgorgement of the profits Defendants have earned through acquisition of the Bike Game and Blade Ball, subject to the demands for accounting herein.

d.     An equitable accounting of RAS's and Mobile Games' books and records to establish, among other things, the ownership interests in the Usurped Games and Derivative Games, and the proceeds from the Usurped Games and Derivative Games.

e.     The imposition of a constructive trust for the benefit of Plaintiffs on (a) the ownership interests Usurped Games and Derivative Games, and (b) all proceeds and revenue derived from the Usurped Games and Derivative Games to prevent Defendants' further unjust enrichment from Cannata's breach of fiduciary duties, or alternatively, a declaratory judgment that Defendants hold the Usurped Games and Derivative Games and all proceeds and revenue derived from the Usurped Games and Derivative Games as a constructive trustee for Basket.

f.     A permanent injunction requiring the transfer of any and all of each Defendant's ownership interest(s) in the Usurped Games and Derivative Games from Defendants to Plaintiff Basket Entertainment.

g.      An award of punitive damages against Cannata and in favor of Plaintiffs to the extent allowed by law to punish Cannata for the intentional wrongful acts described above and to deter Cannata and others from committing similar wrongful acts.

h.      Expenses, costs and attorneys' fees to the extent permitted by law.

i.      Such other and further relief as the Court deems just and proper.

Dated: November 17, 2023

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Jason S. Meyer*
Jason S. Meyer, #1044078 FL
200 South Biscayne Boulevard, Suite 400
Miami, FL 33131
Tel: (786) 322-7500
Fax: (786) 322-7501
jason.meyer@bclplaw.com

William J. Wortel (*admitted pro hac vice*)
161 North Clark Street, Suite 4300
Chicago, IL 60601
Tel: (312) 602-5000
Fax: (312) 602-5050
Bill.wortel@bclplaw.com

Attorneys for Plaintiffs,
Basket Entertainment, Inc. and Basket Technologies, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of November, 2023, the foregoing was

sent via electronic mail and U.S. Mail to the following counsel for Defendants:

Adam Starr
Markowitz Herbold PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Tel:  503-295-3085
Email:  AdamStarr@MarkowitzHerbold.com

*/s/ Jason S. Meyer*